IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

IAN BEHAR, DANIEL BLUMKIN, and RYAN SASSON

Plaintiffs,

v.

FEDERAL INSURANCE COMPANY, ARGONAUT INSURANCE COMPANY, and RSUI INDEMNITY COMPANY,

Defendants.

C.A. No. 25-538-JLH-LDH

FILED

FEB - 4 2026

U.S. DISTRICT COURT DISTRICT OF DELAWARE

**REPORT AND RECOMMENDATION**

Pending before the Court are cross-Motions for Judgment on the Pleadings filed by Plaintiffs Ian Behar ("Behar"), Daniel Blumkin ("Blumkin"), and Ryan Sasson ("Sasson") (collectively, "Plaintiffs" or "D&Os"), and Defendants Federal Insurance Company ("Federal"), Argonaut Insurance Company ("Argonaut"), and RSUI Indemnity Company ("RSUI") (collectively, "Defendants" or "Insurers"). (D.I. 20, 32). The motions have been fully briefed. (D.I. 21, 33, 37, 41). Plaintiffs have also filed a Request for Judicial Notice to which Defendants have taken no position. (D.I. 38, 42). For the following reasons, I recommend that Plaintiffs' Motion for Partial Judgment on the Pleadings be GRANTED-IN-PART and DENIED-IN-PART and Defendants' Motion for Judgment on the Pleadings be GRANTED-IN-PART and DENIED-IN-PART.

## I. BACKGROUND

The Parties agree that the facts relevant to the cross-motions are undisputed and are drawn from the pleadings in this case, insurance policies, and pleadings from the lawsuit brought by the Consumer Financial Protection Bureau ("CFPB") and several state attorneys general on January

10, 2024 (the "CFPB Action"), captioned *Consumer Financial Protection Bureau, v. Stratfs, LLC*, Case No. 24-cv-40-EAW-MJR, in the United States District Court for the Western District of New York. (D.I. 21 at 9; D.I. 33 at 4). This action was originally filed in the Superior Court for the State of Delaware, Case No. N25C-003-315 PAW CCLD. Defendants removed the case to this Court on May 2, 2025, and filed their answers to the Complaint on May 27, 2025. (D.I. 12, 13, 14).

**a. The CFPB Action**

This case is about whether the Defendants have a duty to defend and provide coverage to Plaintiffs in the CFPB Action pursuant to implicated insurance policies. (D.I. 1-1 (the "Complaint") ¶ 11). The CFPB Action alleges that the entire business structure of Strategic Family, Inc. ("SFS" or "Strategic") is unlawful. The CFPB Action also names Plaintiffs as individual defendants for their roles as founders of SFS before creating single-member shell holding companies to funnel money from SFS to themselves. (D.I. 33, Ex. A (the "CFPB Complaint") ¶ 24). The CFPB Action alleges that Plaintiffs, by and through subsidiaries that they own, orchestrated and controlled a scheme to collect excessive advance fees from consumers suffering from financial difficulties in exchange for misrepresented debt-relief services, all in violation of the Telemarketing and Consumer Fraud and Abuse Prevention Act (the "Telemarketing Act"), the Telemarketing Sales Rule (the "TSR"), the Consumer Financial Protection Act of 2010 (the "Consumer Act"), and numerous state statutes. (*Id.* ¶¶ 2, 12–14). The CFPB Action contains 11 counts: (1) charging advance fees in violation of the TSR by collecting money before the consumer has made a payment under a settlement plan; (2) collecting advance fees in violation of the TSR by collecting fees after settling some, but not all, debts with disproportionate fees to the amount saved; (3) substantial assistance in the violation of the TSR,

against Strategic; (4) substantial assistance in violation of the TSR, against the individual defendants; (5) deception in violation of the TSR by telling consumers they were "pre-approved" for loans; (6) deception in violation of the TSR by telling consumers this was a "0% interest option;" (7) repeated fraudulent acts in violation of New York Executive Law § 63(12); (8) engaging in deceptive acts or practices in violation of New York General Business Law § 347; (9) receiving funds and assets obtained through unlawful practices held in constructive trust; (10) operating as an adjustment service company in the state of Wisconsin without a license; and (11) violations of Wisconsin adjustment service company rules. (*Id.* ¶¶ 230–315).[1]

**b. The Insurance Policies**

Federal issued Policy No. 8260-9085 (the "Federal Policy") to Strategic for the Policy Period of August 31, 2023, to August 31, 2024. (D.I. 1-1 ¶ 16; D.I. 33 Ex. B). Argonaut and RSUI issued excess Policy No. MLX4261406-2 (the "Argonaut Policy), and excess Policy No. HS706856 (the "RSUI Policy") to Strategic for the same Policy Period as the Federal Policy, with RSUI's excess policy not being implicated until the policy limit has been reached for both the Federal Policy and the Argonaut Policy. (D.I. 1-1 ¶¶ 29, 30).

The Federal Policy provides "claims-made" insurance coverage under various coverage parts, including a "Directors & Officers and Entity Liability Coverage Part" (the "DOCP"). (D.I. 33 Ex. B). Insuring Clause A in the DOCP provides that "[t]he **Company** shall pay, on behalf of an **Insured Person, Loss** on account of a **Claim** first made against the **Insured Person** during the **Policy Period** . . . to the extent that such **Loss** is not indemnified by an **Organization.**" (*Id.* at DOCP § I(A) (emphasis in original)). Loss is defined to include Defense Costs, which in turn is

[1] Counts 3 and 9 are not at issue in this action because they do not involve the Plaintiffs as individual defendants in the CFPB Action. (*See* CFPB Complaint ¶¶ 247–56, 302–06).

defined to include Asset Protection Costs. (*Id.* at DOCP § IV, Endorsement No. 8 ¶ (1)(B)). Claim is defined, in relevant part, as "any . . . civil proceeding commenced by the service of a complaint or similar pleading." (*Id.* at DOCP § IV). Organization means Strategic and its Subsidiaries, and Insured Person includes any Executive (including directors or officers) of an Organization. (*Id.* at General Terms and Conditions § II, DOCP § IV). The Plaintiffs, as directors and officers of Strategic and its Subsidiaries, are considered Insured Persons. (D.I. 1-1 ¶ 21).

The Federal Policy defines Professional Services to mean "services which are performed for others for a fee." (Policy DOCP § IV). The first paragraph of Endorsement No. 1 contains the Professional Services Exclusion that is at issue in this case. It provides that "[t]he Company shall not be liable under this Coverage Part for **Loss** on account of any **Claim** based upon, arising from, or in consequence of the rendering of, or failure to render, any **Professional Services** by an **Insured.**" (*Id.* at Exclusion No. 1 (emphasis in original)).

## II. LEGAL STANDARD

### a. Motion for Judgment on the Pleadings

A party may move for judgment on the pleadings, pursuant to Federal Rule of Civil Procedure 12(c) "[a]fter pleadings are closed—but early enough not to delay trial." When evaluating a motion for judgment on the pleadings, the court must accept all factual allegations in a complaint as true and view them in the light most favorable to the non-moving party. *Rosenau v. Unifund Corp.*, 539 F.3d 218, 221 (3d Cir. 2008); *Maio v. Aetna, Inc.*, 221 F.3d 472, 482 (3d Cir. 2000). This standard mirrors the standard applied to Rule 12(b)(6) motions to dismiss. *See Turbe v. Gov't of Virgin Islands*, 938 F.2d 427, 428 (3d Cir. 1991).

A rule 12(c) motion will not be granted unless "the movant clearly establishes that no material issue of fact remains to be resolved and that [they are] entitled to judgment as a matter of

law." *Rosenau*, 539 F.3d at 221. "The purpose of judgment on the pleadings is to dispose of claims where the material facts are undisputed and judgment can be entered on the competing pleadings and exhibits thereto, and documents incorporated by reference." *Venetec Int'l, Inc. v. Nexus Med., LLC*, 541 F. Supp. 2d 612, 617 (D. Del. 2008); *see also In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997) (explaining that any documents integral to pleadings maybe considered in connection with Rule 12(c) motion). "The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Burlington Coat Factory*, 114 F.3d at 1420. Thus, a court may grant a motion for judgment on the pleadings (like a motion to dismiss) only if, after "accepting all well-pleaded allegations in the complaint as true, and viewing them in the light most favorable to plaintiff, plaintiff is not entitled to relief." *Maio*, 221 F.3d at 482.

The court considers matters of public record, as well as authentic documents upon which the complaint is based if attached to the complaint or as an exhibit to the motion. *Oshiver v. Levin, Fishbein, Sedran & Berman*, 38 F.3d 1380, 1384 n.2 (3d Cir. 1994), *overruled on other grounds by Rotkiske v. Klemm*, 890 F.3d 422 (3d Cir. 2018) (en banc). Further, the court may also take judicial notice of the factual record of a prior proceeding. *See Oneida Motor Freight, Inc. v. United Jersey Bank*, 848 F.2d 414, 416 n.3 (3d Cir. 1988). Ultimately, a motion for judgment on the pleadings can only be granted if "no relief could be afforded under *any* set of facts that could be proved." *Turbe*, 938 F.2d at 428 (emphasis added).

**b. Judicial Notice**

Under Federal Rule of Evidence 201(b), the Court may take judicial notice of a fact that is not subject to reasonable dispute because it "(1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose

accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b). If a party requests judicial notice and "the court is supplied with the necessary information," the court "must take judicial notice." Fed. R. Evid. 201(c).

**c. Interpretation of Delaware Contract Law**

Under Delaware law, courts interpreting an insurance contract should read the policy "as a whole[,]" apply clear and unambiguous terms according to their "plain and ordinary meaning[,]" and enforce the policy as written. *In re Verizon Ins. Coverage Appeals*, 222 A.3d 566, 573 (Del. 2019). A policy "is ambiguous only when the provisions in controversy are reasonably or fairly susceptible of different interpretations or may have two or more different meanings." *In re Solera Ins. Coverage Appeals*, 240 A.3d 1121, 1131 (Del. 2020) (internal citation omitted). "Absent some ambiguity, Delaware courts will not destroy or twist policy language under the guise of construing it." *Rhone-Poulenc Basic Chems. Co. v. Am. Motorists Ins. Co.*, 616 A.2d 1192, 1195 (Del. 1992).

Insurers have the burden to prove that an exclusion applies to bar coverage. *Nat'l Amusements, Inc. v. Endurance Am. Specialty Ins. Co.*, 2025 WL 720455, at *7 (Del. Super. Ct. Feb. 17, 2025). When an insurance policy contains a "duty to defend," that duty applies when the allegations in the Complaint show "potential that liability within coverage will be established." *Smith v. Liberty Mut. Ins. Co.*, 201 A.3d 555, 561 (Del. Super. Ct. 2019) (*quoting Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. Rhone-Poulenc Basic Chems. Co.*, 1992 WL 22690, at *7 (Del. Super. Ct. Jan. 16, 1992)). No duty to defend exists "if it can be determined as a matter of law that there is no possible factual or legal basis upon which the insurer might eventually be obligated to indemnify the insured." *Id.* (quoting *Nat'l Union*, 1992 WL 22690, at *8).

In determining whether a potential for coverage and duty to defend exists, the court should compare the policy and the underlying pleadings. *Id.* at 560. To avoid the duty to defend, an

insurer must show that the allegations in the underlying complaint are solely and entirely within a specific and unambiguous exclusion from coverage. *Harleysville Mut. Ins. Co. Inc. v. Sussex Cnty.*, 831 F. Supp. 1111, 1130 (D. Del. 1993). To preclude coverage, an exclusionary clause must be specific, clear, plain conspicuous and not contrary to public policy. *RSUI Idem. Co. v. Murdock*, 248 A.3d 887, 906 (Del. 2021). Language is ambiguous if it permits two or more reasonable interpretations. *Hallowell v. State Farm Mut. Auto. Ins. Co.*, 443 A.2d 925, 926 (Del. 1982). If the terms are ambiguous, they are construed against the insurer and, if there is any doubt as to the application of the exclusion to a set of allegations, that doubt is resolved in favor of coverage when there is coverage for claims that potentially fall within the covered risk. *Steigler v. Ins. Co. of N. Am.*, 384 A.2d 398, 400–01 (Del. 1978).

## III. DISCUSSION

### a. Judicial Notice of the CFPB Action

Plaintiffs ask that I take judicial notice of the CFPB Action (D.I. 33), and Defendants have taken no position. (D.I. 42). Judicial notice, for purposes of a Rule 12(c) motion, only extends to the issues decided and facts found by the court in the prior action; it does not extend to "transcripts of the proceedings that took place during the action." *Purdue Pharma L.P. v. Accord Healthcare Inc.*, 2023 WL 5835811, at *2 (D. Del. Sept. 8, 2023) (citing *M & M Stone Co. v. Pa.*, 388 F. App'x 156, 162 (3d Cir. 2010)); *see M & M*, 388 F. App'x at 162 ("a court that examines a transcript of a prior proceeding to find facts converts a motion to dismiss into a motion for summary judgment.") (quoting *Lum v. Bank of Am.*, 361 F.3d 217, 221 n.3 (3d Cir. 2004)). Accordingly, I recommend that the Court grant Plaintiffs' request for judicial notice, excepting the transcripts quoted and referenced therein.

**b. Whether Defendants Have a Duty to Defend Plaintiffs in the CFPB Action**

Defendants seek complete dismissal of the Complaint via their motion for judgment on the pleadings; Plaintiffs only seek partial judgment on the pleadings. (*See* D.I. 20, 32). Specifically, Plaintiffs ask this Court to determine that: (1) Defendants have a duty to defend Plaintiffs in the underlying CFPB Action; (2) Federal has breached its duty to defend Plaintiffs; and (3) for Counts I and III of the Complaint, and as to Federal's second, Argonaut's third, and RSUI's twelfth affirmative defenses, judgment be entered in their favor. (D.I. 20 at 3). Both parties agree that Delaware law should control the interpretation of the insurance contract, so I will proceed accordingly. The Court must consider whether each cause of action alleged against Plaintiffs in the CFPB Action falls within the Professional Services Exclusion (the "PSE").

Plaintiffs assert that the PSE's application should fail for four reasons: (1) the PSE to Insuring Clause A is ambiguous; (2) the allegations in the CFPB Action arise from improper managerial conduct, not from "professional services[;]" (3) adopting Defendants' argued application of the PSE would contradict Delaware law and public policy, as it renders the policies illusory; and (4) it conflicts with the intent of the policies and Plaintiffs' reasonable expectation of coverage from the policies. (D.I. 21 at 12–13). I address each argument in turn.

**i. Insuring Clause A**

I begin by determining whether the Professional Services Exclusion applies to Insuring Clause A ("Clause A") (individual non-indemnified liability coverage). (*Id.* at 5, 18–20). Plaintiffs assert that an ambiguity exists as to whether the PSE in Endorsement No.1 applies to Clause A or only applies to Insuring Clause C ("Clause C") in Exclusion (B)(6)(c) in Section V(organization liability coverage). (D.I. 21 at 14–16). There are two categories of exclusion in Section V of the Plaintiffs' coverage: (1) those applying to all Insuring Clauses, including Clause

A, and (2) those that only apply to Clause C. (*See generally* the Federal Policy § V). Defendants argue that the plain language of the provision at issue here applies to the policy as a whole, not just Clause C, the Organization Coverage Exclusion. (*See* D.I. 33 at 10–11). Endorsement No. 1 to the DOCP, titled "Professional Services Exclusion Endorsement" provides that "[Insurers] shall not be liable under this Coverage Part for Loss on account of any Claim based upon, arising from, or in consequence of the rendering of, or failure to render any Professional Services by an Insured." (Federal Policy at Endorsement No. 1).

By its plain language, Delaware law requires that I read the policy "as a whole" and apply the clear and unambiguous terms according to their "plain and ordinary meaning[.]" *In re Verizon*, 222 A.3d at 573.

Guided by that principle, Endorsement No. 1 applies to Clause A and to the policy as a whole. (*See* D.I. 21 at 14–16, 20). Accordingly, I recommend that judgment be entered in Defendants' favor as to the applicability of the PSE to both Organizations and Individuals: that is, to Clause A. In reaching this determination, I have considered all of Plaintiffs arguments, including that Endorsement No. 1 "deletes and replaces" the Entity Professional Services Exclusion. It does not. Rather, it deletes the latter and adds in the Professional Services Exclusion as applied to the Policy as a whole. This is not a "modif[ication] and broaden[ing] [of] the scope" of the PSE for entities and organizations, as Plaintiffs argue. (*See* Federal Policy § V(B); D.I. 37 at 7–8). Rather, it is a new clause being added to the policy, and absent explicit language that this is modifying the Entity Professional Services Exclusion, I cannot determine it was intended to be understood as Plaintiffs argue. *See ConAgra Foods, Inc. v. Lexington Ins. Co.*, 21 A.3d 62, 69 (Del. 2011) (holding that ambiguity does not exist "where the court can determine the meaning of a contract without any other guide than a knowledge of the simple facts on which, from the nature

of language in general, its meaning depends.") (internal citation omitted). Here, Defendants successfully argue that the only reasonable interpretation about this deletion and addition is that the PSE sought to get rid of the narrow policy exclusion and apply Endorsement No. 1 to the policy as a whole. Plaintiffs cite no authority to the contrary and provide no persuasive argument otherwise.

Additionally, the language in Endorsement No. 1 is not ambiguous. Ambiguity exists when policy language lends itself to "two or more different meanings[.]" *In re Solera Ins.*, 240 A.3d at 1131. The PSE necessitates analysis of the meanings of several terms contained therein that could have multiple meanings: (1) a Claim; (2) Professional Services; and (3) an Insured. Delaware law interprets "Claim" to refer to each cause of action in a civil proceeding, while the policy defines it as "a civil proceeding commenced by the service of a complaint[.]" *See id.*; (D.I. 33 at 2, 15–16); *AT&T Corp. v. Faraday Cap. Ltd.*, 918 A.2d 1104, 1109 (Del. 2007). The Federal Policy defines "Professional services" to mean "services which are performed for others for a fee." *See* Federal Policy DOCP § IV. Endorsement No. 1 and the PSE apply to Claims that are "based upon, arising from, or in consequence of" the rendering, or lack thereof, of a professional service. Finally, the exclusion refers to claims as "the rendering of, or failure to render, any Professional Services by an Insured." (*See* Federal Policy at DOCP Endorsement No. 1). Each term is explicitly defined within Endorsement No. 1.

Plaintiffs seek to have the PSE barred entirely. Plaintiffs' argument that none of the allegations from the CFPB Action arise from the provision of "Professional Services" is nonsensical. (D.I. 21 at 14–17). The allegations of the complaint in the CFPB Action contain numerous facts that Plaintiffs were engaged in Professional Services—providing debt-relief for clients—and that their entire business model revolved around providing such services.

Accordingly, I will proceed with my analysis of each of the Claims in the CFPB Action pursuant to my determination that the PSE ought to apply so long as the claims arise from, are based upon, or in consequence of the professional debt-relief services, which Plaintiffs are alleged to have performed illegally.

**ii. Counts of the CFPB Action**

For ease of analysis, I group the CFPA Action claims as follows: (1) Counts 1, 2, 4 and 11—Plaintiffs violated federal and state law by charging fees for debt-relief services before those services were provided or by charging disproportionate fees to the debts settled and amounts saved, and for substantial assistance in furthering these violations; (2) Count 10—operating as an adjustment service without the proper license; and (3) Counts 5, 6, 7, and 8—deceptive practices in using false promises of loans to sell debt-relief services and false descriptions thereof. First, I note that the gravamen of the action against Plaintiffs in the CFPB Action that they charged for the performance of professional services, namely debt-relief, and did not provide it. It is not, as Plaintiffs argue, "misconduct in governance and business oversight[.]" (*See generally* CFPB Complaint ¶¶ 230–315). For the PSE to apply to an individual count, it must be "based upon, arising from, or in consequence of" Professional Services and there must be a "meaningful linkage" between the claim and the service.

Counts 1, 2, 4, and 11 relate to Plaintiffs' improperly providing professional services by, generally, charging fees for debt-relief services before those services were provided, or by charging disproportionate fees to the debts settled and amounts saved, and for substantial assistance in furthering these violations. (*See* CFPB Complaint ¶¶ 230–46, 257–70, 312–15). In spite of this, Plaintiffs argue that all the Counts from the CFPB are merely tangentially related to the conducting of their business, and not meaningfully linked. (*Id.*). Even a cursory reading of

the CFPB complaint shows that this is not true. These violations would not have occurred "but for" Plaintiffs conducting their business, and each is intrinsically linked with the provision, or lack thereof, of a professional service. The two cannot be separated such that the PSE does not apply here. These counts are all meaningfully linked, and Plaintiffs have offered little to persuade the Court that they do not "arise from . . . the rendering of, or failure to render" a professional service.

Similar to the first group, Count 10 falls squarely under the PSE. Count 10 relates to Plaintiffs' operation of SFS in violation of Wisconsin state law by operating a debt-relief service, and it is nearly identical to counts 1, 2, 4, and 11. Plaintiff was performing services, namely debt relief, and it had no license to do so in the state of Wisconsin. For the same reason that their argument failed as to Counts 1, 2, 4, and 11, it fails here: this is not tangentially linked to the conduction of business as Plaintiffs argue—rather, Count 10 maintains that Plaintiffs performed services for a fee and "but for" these services, there would have been no violation. Accordingly, I recommend that as to Counts 1, 2, 4, 10, and 11, the Court determine the Defendants have no duty to defend Plaintiffs in the CFPB Action.

But as to the third category of claims (Counts 5 through 8), I agree with Plaintiffs. (*See* CFPB Complaint ¶¶ 271–301). These counts deal with deceptive practices in using false promises of loans to sell debt-relief services and false descriptions thereof. For example, Count 6 alleges deception in violation of the TSR:

> SFS made several misrepresentations about material aspects of the debt-relief services offered by Defendants and the Façade Firms in violation of the TSR . . . .
>
> During the sales process, SFS employees routinely refer to the debt-relief service as the "0% interest option" while speaking with consumers . . . .
>
> Referring to the debt-relief service as the "0% interest option" creates confusion for consumers, particularly in light of the mailers

> many consumers received claiming they were "preapproved" for a debt-consolidation loan . . . .
>
> In truth, the debt-relief service is not a loan . . . .
>
> Individual Defendants Sasson and Blumkin . . . knew or consciously avoided knowing that: (1) SFS employees made deceptive statements about the accrual of interest while consumers were in the debt-relief program; and (2) SFS was selling debt-relief services by phone, including through interstate calls.

(CFPB Complaint ¶¶ 280–86). Distinguishable from the first group of claims where Plaintiffs are alleged to have defrauded folks in connection with providing (or failing to provide) Professional Services, the second group of claims deal with false statements intended to induce potential victims to enroll in the program. Inducing an individual is not the performance, or lack thereof, of a professional service as there is no meaningful linkage between the two. *See Gallup, Inc. v. Greenwich Ins. Co.*, 2015 WL 1201518, at *12 (Del. 2015) (broadly drafted PSE language which includes "virtually any aspect of" a business would give "[no] meaningful effect to a policy" and "undermines the purpose of having an insurance policy."). Further, the solicitation of debt relief services is not the performance thereof, and false statements about services offered—i.e., a "0% interest option"—to induce individuals to subscribe in the debt-relief plan are not, in and of themselves, a professional service, either offered or a failure to do so. *Id.*; *see also Pangea Equity Partners, LP v. Great Am. Ins. Grp.*, 2025 WL 786050, at *5 (Del. Super. Ct. Mar. 12, 2025) ("Delaware law mandates that insurance policy exclusion clauses are to be construed narrowly" (internal citation omitted)). Although I have considered Defendants' argument that the inducement and provision of services is "meaningfully linked," that connection is not supported by the plain language of the averments in counts 5–8 of the CFPB Action.[2] In contrast to the previous two

---

[2] At best, there is an "incidental connection" between the PSE and counts 5–8, Defendants admit that an "incidental connection is not enough[.]" (D.I. 33 at 14).

groups of Counts in the CFPB Action, these are the advertisement of services, and thus, there is "no causal connection [] between the failure to perform [professional] services and the damages alleged[.]" *ACE Am. Ins. Co. v. Guaranteed Rate, Inc.*, 305 A.3d 339, 347 (Del. 2023)

In support of their argument, Plaintiffs rely on *Guaranteed Rate*, and I agree it is applicable here. (D.I. 21 at 16–18; D.I. 33 at 18–21). In *Guaranteed Rate*, the court noted that "Delaware courts have interpreted liberally the words 'arising out of' in insurance policies." 305 A.3d at 347. The court then relied on and agreed with a prior Delaware Supreme Court decision holding that "but for" causation satisfies "arising out of" language in an exclusion. *Id.* (citing *Eon Labs Mfg., Inc. v. Reliance Ins. Co.*, 756 A.2d 889, 893 (Del. 2000)). The court explained however that the "but for" standard was not satisfied in that case, as "the FCA claims were not caused by the professional services provided to borrowers" because there was "no causal connection [] between the failure to perform [professional] services and the damages alleged by the government." *Id.* Same here. Plaintiff's inducement of individuals may be satisfied under Pennsylvania or Florida law, on which Defendants' cases rely, but this does not meet the meaningful linkage required of Delaware contracts. (*See* D.I. 33 at 15–18 (citing *MDL Capital Mgmt, Inc. v. Fed. Ins. Co.*, 274 F. App'x 169 (3d Cir. 2008) and *Goldberg v. Nat'l Union Fire Ins. Co.*, 143 F. Supp. 3d 1283 (S.D. Fla. 2015))). The PSE must be construed narrowly (*Pangea Equity*, 2025 WL 786050, at *5), and doing so here means there is no causal relationship between the inducement into the program and the failure to provide services; the inducement is one step too far removed.

To apply the PSE to claims arising out of misleading marketing tactics because they would inevitably lead to Plaintiffs' provision of a service impermissibly broadens the exclusion. Inducement to purchase a Professional Service is not "based upon, arising from, or in consequence of" any Insured's rendering, or failure to render, a Professional Service. Accordingly, I

recommend that judgment be entered in Plaintiffs' favor as to Counts I and III of the complaint, and as to Federal's second and Argo's third affirmative defenses.

**iii. Delaware Law and Public Policy and Reasonable Expectation of Coverage**

Plaintiffs third and fourth arguments, that applying the PSE would run contrary to established Delaware law and public policy, and that applying the PSE conflicts with the intent of the policies and their reasonable expectation of coverage, respectively, require no separate analysis. I have already determined that Defendants owe a duty to defend Plaintiffs as to some of the claims in the CFPB Action and have addressed the applicability of the PSE above. The application of the PSE is not, as Plaintiffs assert, in and of itself contrary to Delaware law and public policy; rather, I must construe the exclusion narrowly to each claim, and I have done so. Further, its application here does not remove the reasonable expectation of coverage between the parties as the PSE notes that it does not cover anything arising from professional services; that is what I have applied it to in this case. *See supra* § 3(b)(ii). Interpreting the Federal Policy in this way is not contrary to Delaware law and policy or to the reasonable expectation of coverage; rather, it is in accord with Delaware law.

**c. Bad Faith Claim**

Plaintiffs' bad faith claim survives. *See Casson v. Nationwide Ins. Co.*, 455 A.2d 361, 369 (Del. Super. Ct. 1982) (to establish bad faith, Plaintiff must show that "the insurer's refusal to honor its contractual obligation was clearly without any reasonable justification"); *but see GEICO Gen. Ins. Co. v. Green*, 308 A.3d 132, 145 (Del. 2022) ("[w]ithout a showing of an underlying breach, there can be no claim for bad faith breach of contract."). I cannot determine at the pleading stage whether bad faith exists, but Plaintiffs have alleged that Defendants refused to honor their

contractual obligations to defend, and that Defendants do have some duty to defend as to certain of the claims.

Accordingly, I recommend that Defendants' motion for judgment be denied as to Plaintiffs' bad faith claim.

**d. Whether there is a Case or Controversy between Plaintiffs and RSUI**

A declaratory judgment action requires: (1) a controversy involving the rights or legal relations of the parties seeking relief; (2) an adverse party with an interest in contesting the claim; (3) a real and substantial dispute between the parties; and (4) a controversy ripe for judicial determination. *XL Specialty Ins. Co. v. WMI Liquidating Trust*, 93 A.3d 1208, 1217 (Del. 2014).

Plaintiffs argue that there is a "current, concrete dispute" between them and RSUI because they allege they have already incurred $3.5 million in defense costs, and this will "inevitably surpass the $5 million attachment point for RSUI's coverage." (D.I. 37 at 21). But Plaintiffs cite nothing to indicate that the costs will likely reach that amount, nor do they include a breakdown of current costs enabling the Court to make an informed judgment on costs going forward. So, it's possible. But also, maybe not. Defendants argue that Plaintiff's "inevitabl[e]" accrual of over $5 million in defense costs is little more than a vague and undefined future loss, without any reasonable likelihood. Without a "reasonable likelihood," there can be no live and justiciable controversy between RSUI and Plaintiffs. (D.I. 33 at 25). Plaintiffs also admit some of their defense costs have been mitigated, they do not say how much, by an excess umbrella Difference in Condition Side A insurer. (*See* D.I. 17 at 13 n.46).

I agree with Defendants here that RSUI's excess policy—which is only implicated after the first excess policy of Argonaut is exhausted—is at this point a hypothetical and speculative. *See Monsanto Co. v. Aetna Cas. & Sur. Co.*, 565 A.2d 268, 275 (Del. Super. Ct. 1989) ("it would

not be in the best interest of judicial economy to proceed upon a claim for declaratory judgment against the Excess Carriers where the actual controversy is hypothetical at best"). Accordingly, I recommend that judgment be entered in Defendants' favor as to RSUI's secondary surplus coverage policy.

## IV. CONCLUSION

For the foregoing reasons, I recommend that Plaintiffs' Motion for Partial Judgment on the Pleadings be GRANTED-IN-PART and DENIED-IN-PART and Defendants' Motion for Judgment on the Pleadings be GRANTED-IN-PART and DENIED-IN-PART. I recommend that judgment be entered in Plaintiffs' favor as to Counts I and III of the complaint, and as to Federal's second and Argo's third affirmative defenses and DENIED as to RSUI. I also recommend that Defendants' Motion be GRANTED as to the case and controversy with RSUI and DENIED on all other grounds.

This Report and Recommendation is filed pursuant to 28 U.S.C. § 636(b)(1)(B), (C), Federal Rule of Civil Procedure 72(b)(1), and D. Del. LR 72.1. Any objections to the Report and Recommendation shall be filed within fourteen days and limited to ten pages. Any response shall be filed within fourteen days thereafter and limited to ten pages. The failure of a party to object to legal conclusions may result in the loss of the right to de novo review in the District Court.

The parties are directed to the Court's "Standing Order for Objections Filed Under Fed. R. Civ. P. 72," dated March 7, 2022, a copy of which can be found on the Court's website.

Dated: February 4, 2026

Laura D. Hatcher
United States Magistrate Judge